IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| APRIL FREELAND, NORMAN FREELAND, )<br><br>Plaintiffs, )<br><br>v. )<br><br>COUNTY OF MAUI, GARY YABUTA,<br>JERALD PERKETT, JEFFREY<br>CALIBUSO, KEOKI SANTOS, RICHARD<br>DODS, CHRISTOPHER GANTALA,<br>KENNETH CARROLL, CLIFFORD<br>DAGULO, JAMIE WRIGHT, MATTHEW<br>BROWN, EDUARDO BAYLE,<br>CHRISTOPHER KEALOHA, CLIFTON<br>PERREIRA, GREGG OKAMOTO, MATTHEW<br>BIGOSS, JOHN DOE 1-20, DOE<br>ENTITIES 1-20,<br><br>Defendants. | Civ. No. 11-00617 ACK-KSC |

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT

For the reasons stated in this written order, the Court
GRANTS the individual officers' motion, (Doc. No. 137), and
GRANTS IN PART AND DENIES IN PART the motion filed by the County
of Maui, Chief Yabuta, and Officers Bigoss and Perkett, (Doc. No.
135), as follows:

1)   As to Defendants Perkett and Bigoss, the Court GRANTS
IN PART AND DENIES IN PART their motion for summary judgment,
(Doc. No. 135). The Court GRANTS the motion as to Plaintiffs'
official capacity claims against Bigoss and Perkett. The Court

further GRANTS the motion as to Plaintiffs' claims for state law assault and battery and negligent infliction of emotional distress. Plaintiffs' state law claims against Officers Bigoss and Perkett for assault, battery, and negligent infliction of emotional distress are DISMISSED WITHOUT PREJUDICE. The Court DENIES the motion as to all of Plaintiffs' remaining claims against Defendants Bigoss and Perkett.

    2)   As to the remaining individual officers, Defendants Calibuso, Santos, Dods, Gantala, Carroll, Dagulo, Wright, Brown, Bayle, Kealoha, Perreira, and Okamoto, the Court GRANTS their motion for summary judgment, (Doc. No. 137), in its entirety. All of Plaintiffs' claims against the remaining individual officers are DISMISSED WITHOUT PREJUDICE.

    3)   As to Defendants the County of Maui and Chief Yabuta, the Court GRANTS IN PART AND DENIES IN PART their motion, (Doc. No. 135). The Court GRANTS the motion as to all of Plaintiffs' claims against Chief Yabuta. Plaintiffs' claims against Chief Yabuta are DISMISSED WITHOUT PREJUDICE. The Court further GRANTS the motion as to Plaintiffs' federal claims, Plaintiffs' state law claim for negligent training, and Plaintiffs' claim for punitive damages as against the County of Maui. These claims against the County of Maui are DISMISSED WITHOUT PREJUDICE. The Court DENIES the motion as to Plaintiffs' state law respondeat superior claim against the County of Maui based on the alleged

torts committed by Officers Bigoss and Perkett.

## PROCEDURAL BACKGROUND

Plaintiffs April and Norman Freeland filed the operative complaint, their Second Amended Complaint, on January 25, 2013. (Doc. No. 122 ("SAC").) Defendants the County of Maui, Eduardo Bayle, Matthew Bigoss, Matthew Brown, Jeffrey Calibuso, Kenneth Carroll, Clifford Dagulo, Richard Dods, Christopher Gantala, Christopher Kealoha, Gregg Okamoto, Jerald Perkett, Clifton Perreira, Keoki Santos, Jamie Wright, and Gary Yabuta. (collectively, "Defendants") filed an Answer to the Second Amended Complaint on February 8, 2013. (Doc. No. 125.)

On September 18, 2013, Defendants the County of Maui, Matthew Bigoss, Jerald Perkett, and Gary Yabuta (together, the "County Defendants") filed a Motion for Summary Judgment (the "County Motion"), supported by a concise statement of facts and numerous exhibits. (Doc. Nos. 135, 136.) On the same day, Defendants Eduardo Bayle, Matthew Brown, Jeffrey Calibuso, Kenneth Carroll, Clifford Dagulo, Richard Dods, Christopher Gantala, Christopher Kealoha, Gregg Okamoto, Clifton Perreira, Keoki Santos, and Jamie Wright (collectively, the "Officer Defendants") filed a separate Motion for Summary Judgment (the "Officers' Motion"), supported by a concise statement of facts and numerous exhibits. (Doc. Nos. 137, 138.) The two motions are nearly identical.

3

Plaintiffs filed memoranda in opposition to the two motions ("County Opp'n" and "Officer Opp'n"), supported by concise statements of facts[1] and numerous exhibits on November 4, 2013. (Doc. Nos. 144-155.) The County Defendants and Officer Defendants each filed a reply in support of their motion on November 8, 2013. (Doc. Nos. 156, 157.)

The hearing on the motions was held on November 25, 2013.

## FACTUAL BACKGROUND[2]

This case arises from a police raid of the home of Plaintiffs April and Norman Freeland by officers of the Maui Police Department ("MPD") on April 15, 2011. (SAC ¶¶ 23-40.)

The raid on Plaintiffs' home was executed pursuant to a search warrant that was intended for the search of the residence of an alleged drug dealer named Kimberly Uyeda. (County Mot. at 2; Officers' Mot. at 2; County Opp'n at 1.) Before applying for the search warrant, Defendant Bigoss received information from a confidential informant that Kimberly Uyeda was selling crystal

---

[1] Defendants correctly note that Plaintiffs' two concise statements fail to comply with Local Rule 56.1. LR 56.1(d) limits concise statements to no more than five pages or 1,500 words. Plaintiffs' concise statements are both approximately 13 pages long.

[2] The facts as recited in this Order are for the purpose of disposing of the instant motions and are not to be construed as findings of fact that the parties may rely on in future proceedings in this case.

methamphetamine from a house on Manini Place. (County Opp'n at 1; County Mot. at 2.) Officer Bigoss and his supervisor, Sergeant Perkett, later met with the informant who pointed out the house on Manini Place during a daytime drive by, stating that it was the one with "the bamboo fence and the brown." (County Opp'n at 1-2; County Mot. at 2.) Defendants state that the officers believed that the informant was pointing to the Freeland residence, (County Mot. at 2); however, in a deposition Officer Bigoss later stated that the informant pointed to the house "directly next door to the Freelands' house." (County Opp'n Ex. 15 (Deposition of Matthew Bigoss ("Bigoss Dep.")) at 17.)

After conducting the drive by, Officer Bigoss made plans to have the informant conduct a controlled drug purchase at the Manini house, while another officer, Officer Santos, provided surveillance. (County Mot. at 3; Officers' Mot. at 3.) On April 11, 2011, the "controlled buy" was carried out, with Officer Santos relaying to Officer Bigoss that he saw the informant walk towards what he thought might be the gate of a residence on Manini Place, go out of sight, and emerge a few minutes later with a packet of crystal methamphetamine. (County Mem. at 3; County Opp'n at 3.) Officer Santos did not actually witness the informant enter a gate, or enter a house, or purchase the drugs, and Officer Bigoss did not himself go to Manini Place on the night of the controlled buy. (Id.)

After the controlled buy, Officer Bigoss then proceeded to draft an affidavit for a search warrant, relying upon Santos's description of the residence where the controlled buy took place, as well as the description of the residence provided by the informant. (County Mot. at 3-4.) Bigoss conducted a Google Maps search for "323 Manini Place" but no matching house came up on the search. (County Mot. at 4; County Opp'n at 4.) Bigoss therefore assumed that Google Maps was wrong, and based his description of the target residence in the affidavit on a house he found on Google Maps that he believed to be the house identified by the informant. (Id.) Bigoss secured a search warrant for 323 Manini Place on April 14, 2011.

The Plaintiffs allege that they were hosting a dinner at their residence on April 15, 2011, the night of the raid. (SAC ¶ 23.) Sometime around 8:00pm, Plaintiffs heard a noise on their lanai and, when they approached their sliding glass door, they saw men who later turned out to be police officers with "military style guns." (Id. ¶¶ 27-28.) Defendants contend that the police officers did a "knock and announce" at the front sliding glass door, that Mr. Freeland opened the door after they knocked, and that both Plaintiffs were asked to step outside of the house before the officers entered the house. (County Defendants' Concise Statement of Facts ¶¶ 19-21.) Conversely, Plaintiffs allege that the police officers rushed into Plaintiffs' home

without permission and without identifying themselves as police officers. (SAC ¶ 30.) Plaintiffs further allege that the police officers "forcibly took" Plaintiffs outside by grabbing them by the wrists and throwing them onto a couch on their lanai, and "held [them] captive" with a "combat type weapon" while a search of their home was conducted. (Id. ¶¶ 32-34.) Plaintiffs state that they told the officers that they had the wrong house, and that one of the officers told them that they had a search warrant. (Id. ¶¶ 35-36.) Plaintiffs state that the officers did not provide them with the warrant. (Id. ¶ 91.)

The Plaintiffs allege that the officers noticed that they were not at the right house, but nevertheless proceeded to search the Plaintiffs' home, and detain the Plaintiffs and their dinner guests until the search was complete. (Id. ¶¶ 52-61.) Officer Bigoss states, however, that he immediately went to tell Sergeant Perkett when he realized that they were at the wrong house (about thirty seconds to a minute after they arrived at the house). (County Mot. Ex. B (Declaration of Matthew Bigoss ("Bigoss Decl.")) at ¶¶ 17-18.) Sergeant Perkett states that he realized they were at the wrong residence only after the house had been cleared and the raid was complete. (County Mot. Ex. D (Declaration of Jerald Perkett ("Perkett Decl.")) at ¶ 17.) Defendants contend that the officers' initial objective was to clear the house of any threats, that they did not conduct a full

search of the house, and that they exited the property as soon as they realized that they were at the wrong house. (County Defendants' Concise Statement of Facts ¶ 24-26.)

The parties agree that the Plaintiffs' home was not, in fact, the target residence. (See County Mot. at 7; Officers' Mot. at 6; SAC ¶¶ 56, 60-61.) The warrant identified the target residence as "323 Manini Place." (SAC ¶¶ 45, 65.) The Plaintiffs live at 237 Manini Place, and state that their address is clearly and prominently posted on their fence, and that their house has a number of attributes distinguishing it from the surrounding houses, and from the description the confidential informant gave Bigoss. (Id. ¶¶ 1, 74-80.) A few weeks after the raid on the Plaintiffs' home, the MPD executed a search warrant on the house next door to Plaintiffs' house and recovered crystal methamphetamine. (See County Mot. at 8; Officers' Mot. at 7.)

As a result of the raid on Plaintiffs' home, an Internal Affairs investigation focusing on Officer Bigoss began. (County Opp'n Ex. 19 (Deposition of Police Chief Gary Yabuta ("Yabuta Dep.")) at 16, 37.) Officer Bigoss was disciplined for violating MPD policies, including failing to conduct a proper investigation before obtaining a search warrant. (See County Mot. Exs. DD-FF.)

In the Second Amended Complaint, the Plaintiffs make the following claims: (1) a 42 U.S.C. § 1983 unlawful seizure

claim; (2) a 42 U.S.C. § 1983 unlawful arrest claim; (3) a 42
U.S.C. § 1983 unlawful search claim; (4) a 42 U.S.C. § 1983 claim
for inadequate supervision, training, and/or discipline as
against Defendant Yabuta and the County of Maui; (5) a state law
claim for false arrest; (6) a state law claim for battery; (7) a
state law claim for assault; (8) state law claims for intentional
and negligent infliction of emotional distress; (9) a state law
trespass claim; (10) a state law gross negligence claim; (11)
claims against Defendant Yabuta and the County of Maui for
vicarious liability for the acts of the other individual named
officers based on a theory of respondeat superior; (12) a state
law claim for negligent training as against Defendant Yabuta and
the County of Maui; and (13) a state law negligence claim against
all Defendants. (SAC ¶¶ 115-193.)

## STANDARD OF REVIEW

Summary judgment is appropriate when a "movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). The central issue is "whether the evidence presents a
sufficient disagreement to require submission to a jury or
whether it is so one-sided that one party must prevail as a
matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
251-52 (1986).

The moving party bears the initial burden of

demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. Id. at 587.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . . or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 585. "[T]he requirement is that there be no genuine issue of material fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 247-48 (emphasis in original). Also, "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995). Likewise, the nonmoving party "cannot

defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." <u>Hernandez v. Spacelabs Med. Inc.</u>, 343 F.3d 1107, 1112 (9th Cir. 2003).

### DISCUSSION

Both motions filed by the Defendants make substantially the same arguments, and ask the Court to dismiss all claims against all Defendants.

As an initial matter, the Court notes that Plaintiffs are bringing claims against all of the individual named officers both individually and in their official capacities. (SAC ¶ 19.) The claims against these defendants in their official capacities are redundant, however, because the County of Maui is also a named defendant. The Supreme Court noted decades ago that "[t]here is no longer a need to bring official-capacity actions against local government officials, for . . . local government units can be sued directly for damages and injunctive or declaratory relief." <u>Kentucky v. Graham</u>, 473 U.S. 159, 167 n. 14 (1985). <u>See also Monell v. Dep't of Social Services</u>, 436 U.S. 658, 690 n. 55 (1978) (stating that "official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."). As such, the official-capacity claims "duplicate[] the claims asserted against the [County of Maui]" and are therefore DISMISSED. <u>See Wong v. City & Cnty. of Honolulu</u>, 333 F. Supp. 2d 942, 947

11

(2004).

## I.   The § 1983 Claims

Plaintiffs allege, inter alia, that Defendants violated their constitutional rights under the Fourth Amendment by conducting an unlawful search of their home and unlawfully detaining them during that search. Accordingly, Plaintiffs seek relief under 42 U.S.C. § 1983, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity[.]

Thus, to prevail on their § 1983 claims, Plaintiffs must prove two essential elements: (1) "that a right secured by the Constitution or laws of the United States was violated," and (2) "that the alleged violation was committed by a person acting under the color of State law." Long v. Cnty. of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

The Defendants do not contest that they were acting under the color of state law when they conducted the raid on Plaintiffs' home. Rather, Defendants argue that they did not violate Plaintiffs' constitutional rights and are therefore entitled to qualified immunity.

The doctrine of qualified immunity protects government

officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Id. (internal quotation marks omitted).

When examining a claim of qualified immunity, the Court may use a two part test by examining (1) "whether the facts that a plaintiff has alleged make out a violation of a constitutional right" and (2) "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." Id. at 232. A right is clearly established if "a reasonable official would understand that what he is doing violates that right." Saucier v. Katz, 533 U.S. 194, 202 (2001). If the right is not clearly established, then the officer is entitled to qualified immunity. Id. While the order in which these questions are addressed is left to the Court's "sound discretion," "it is often beneficial" to perform the analysis in the sequence outlined above. Pearson, 555 U.S. at 236.

Plaintiffs have the burden of proving the existence of a clearly established constitutional right. Doe v. Petaluma City School District, 54 F.3d 1447, 1450 (9th Cir. 1995). It is the

13

Defendants' burden to show that a "reasonable . . . officer could have believed, in light of the settled law, that he was not violating a constitutional or statutory right." V-1 Oil Co. v. Smith, 114 F.3d 854 (9th Cir. 1997).

When determining whether there are any genuine issues of material fact at the summary judgment stage, a court must take all facts in the light most favorable to the non-moving party. In the context of qualified immunity, determinations that turn on questions of law, such as whether the officers had probable cause or reasonable suspicion to support their actions, are appropriately decided by the court. Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993). However, a trial court should not grant summary judgment when there is a genuine dispute as to "the facts and circumstances within an officer's knowledge" or "what the officer and claimant did or failed to do." Id.

The constitutional right Plaintiffs allege that Defendants violated was their Fourth Amendment right to be free from unreasonable searches and seizures.

**A.    Whether Defendants Violated Plaintiffs' Fourth Amendment Rights**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. v. Place, 462 U.S. 696, 700 (1983). Plaintiffs allege that Defendants violated their Fourth Amendment rights by unlawfully searching their home

14

and detaining them during the search.

### 1.   Unlawful Search

"At the very core" of the Fourth Amendment is the right of a person to be free from unreasonable governmental intrusion in his or her own home. Kyllo v. United States, 533 U.S. 27, 31 (2001). As a result, warrantless searches of a person's home are presumptively unreasonable, subject only to certain narrowly delineated exceptions. Here, it is undisputed that Defendants did not have a warrant authorizing the search of Plaintiffs' residence, 237 Manini Place, and that no exception to the warrant requirement (apart from whatever significance the mistakenly executed warrant had) is applicable.

The Fourth Amendment is not necessarily violated, however, in circumstances such as exist here where officers have mistakenly executed a search warrant on the wrong property. As the Supreme Court stated in Graham v. Connor: "The Fourth Amendment is not violated by . . . the mistaken execution of a valid search warrant on the wrong premises[.]" 490 U.S. 386, 396 (1989) (citing Maryland v. Garrison, 480 U.S. 79 (1987)). In Garrison, police officers obtained and executed a warrant to search "the premises known as 2036 Park Avenue third floor apartment." Id. at 80. The police believed that there was only one apartment on the third floor, but there were in fact two, one occupied by the intended target of the search and the other by

Garrison. In executing the warrant, the officers unknowingly
entered Garrison's apartment and, before becoming aware they were
in the wrong apartment, discovered contraband. In concluding the
contraband should not be suppressed, the Court stated:

> While the purposes justifying a police search
> strictly limit the permissible extent of the
> search, the Court has also recognized the need to
> allow some latitude for honest mistakes that are
> made by officers in the dangerous and difficult
> process of making arrests and executing search
> warrants.

Id. at 87.

The Garrison Court went on to define "honest mistakes"
as "those of reasonable men, acting on facts leading sensibly to
their conclusions of probability" and concluded that the question
was ultimately whether the officers' actions in entering the
wrong residence were "objectively understandable and reasonable"
under the circumstances. Id. at 87-88. As a result, in
determining whether Defendants' entry into the Plaintiffs' home
violated their Fourth Amendment rights, the question becomes
whether the officers' actions, though mistaken, were nonetheless
objectively reasonable so as to make the entry the sort of
"honest mistake" to which Garrison alluded. In the context of the
instant motions for summary judgment, the Court looks to whether
the proffered facts, viewed in the light most favorable to
Plaintiffs, are sufficient to create genuine question of fact as
to the objective reasonableness of the officers' actions.

### a.   Reasonableness in Obtaining the Warrant

First, with respect to Officer Bigoss, Plaintiffs argue that he acted unreasonably in obtaining the search warrant pursuant to which their house was searched. (County Opp'n at 13.)[3] Plaintiffs argue that a police officer in Bigoss's position acting reasonably should have described the location of the target house with sufficient particularity to direct those executing the warrant to the correct house, rather than to Plaintiffs' house. (See id.)

"The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one 'particularly describing the place to be searched and the persons or things to be seized.'" Garrison, 480 U.S. at 84 (quoting U.S. Const. amend. IV). The Supreme Court has held that this requirement is satisfied "if the description is such that the officer with a search warrant can with reasonable effort ascertain and identify the place intended." Steele v. United

---

[3] Defendants argue that Plaintiffs are asserting a claim for judicial deception in the application for the warrant and must therefore demonstrate that Officer Bigoss acted recklessly, rather than simply unreasonably. (County Reply at 1-2.) Plaintiffs appear to state in their opposition, however, that they are not arguing that the warrant was not validly issued but, rather, that Officer Bigoss was unreasonable in applying for the warrant, and that it was mistakenly served on the wrong house. (County Opp'n at 13 n.1.) Plaintiffs' counsel confirmed this at the hearing. As such, the standard for analyzing the officers' conduct is reasonableness, rather than recklessness. See Garrison, 480 U.S. at 88.

States No. 1, 267 U.S. 498, 503 (1925). "The test for determining the sufficiency of the warrant description is whether the place to be searched is described with sufficient particularity to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched." U.S. v. Turner, 770 F.3d 1508, 1510 (9th Cir. 1985) (internal quotation marks and citations omitted).

　　　　Here, it is undisputed that the raid was conducted on the wrong house, and it appears the parties agree that the description of the target house in the warrant was incorrect. (See County Mot. at 15; County Opp'n at 13.) Plaintiffs argue that Bigoss acted unreasonably in describing the target residence in the application because, despite ample evidence that the target residence was brown, including the statements of the informant, Officer Bigoss, after conducting a search on Google Maps, picked a house he guessed was the correct house and described the target residence in the affidavit as "off-white to gray in color with red trim." (County Opp'n at 13-14, Ex. 5 (Search Warrant No. 11-1-0088).) Defendants counter that there is no evidence that Bigoss acted unreasonably: he drove by the location with the confidential informant during the daylight hours and had her point out the house, and believed she had identified Plaintiffs' residence because she mentioned a bamboo

fence (which both Plaintiffs' house and the house next door

have). Bigoss then described the residence in his affidavit as

best he could given the information he had. (Id. at 14-15.)

Plaintiffs have made the required showing that Officer

Bigoss may have acted unreasonably when investigating and setting

forth the description of the target house in the warrant

affidavit. It is undisputed that the confidential informant told

Bigoss that the target house was brown, (Bigoss Decl. at ¶ 8),

yet Bigoss described the house as "off-white to gray in color

with red trim" in his affidavit in support of the warrant.

(County Opp'n Ex. 5.) Further, it is undisputed that a Google

Maps search for 323 Manini Place yielded no results, but that

Bigoss nevertheless assumed that Google Maps was wrong and did

not conduct any further investigation to clarify the correct

address of the target house. (Bigoss Dep. at 25-26.) In light of

these facts, Plaintiffs have at least raised a question of fact

as to whether Bigoss knew or should have known that additional

investigation and/or a more accurate description were needed to

assure that the wrong house was not searched. See Navarro v.

Barthel, 952 F.2d 331, 333 (1991) (concluding that "it is for the

jury to decide whether [the officer] acted reasonably" in

describing the warrant location where there was some question as

to which was the correct house). Although the Court recognizes

"the need to allow some latitude for honest mistakes that are

made by officers in the dangerous and difficult process of making arrests and executing search warrants," Garrison, 480 U.S. at 87, Bigoss's actions in this case were simply not "consistent with a reasonable effort to ascertain and identify the place intended to be searched" as dictated by Garrison. See id. at 88-89.

        The Court therefore concludes that there is a question of fact as to whether Officer Bigoss acted unreasonably when investigating and setting forth the physical location and description of the target house in the warrant application.

        **b.   Reasonableness of Other Officers Who Participated in the Search**

        With respect to the remaining individual officers who participated in the search, Plaintiffs argue that they likewise acted unreasonably when they participated in the search without verifying first that it was lawful. Specifically, Plaintiffs argue that the remaining officers had a duty to independently assess the sufficiency of the affidavit and the warrant prior to executing the warrant, but that they unreasonably failed to do so. (County Opp'n at 11.) Defendants counter that officers participating in the execution of a warrant are protected by qualified immunity when they rely upon their superiors' instructions. (County Mot. at 15-16; Officers' Mot. at 14-15.)

        The Ninth Circuit has made clear that what is reasonable for a particular officer depends on his role in the search. Ramirez v. Butte-Silver Bow Cty., 298 F.3d 1022, 1027

20

(9th Cir. 2002), aff'd sub nom. Groh v. Ramirez, 540 U.S. 551 (2004). The officers who lead a team that executes a warrant are responsible for ensuring that they have a proper warrant that in fact authorizes the search and seizure they are about to conduct. Id. The leaders of the search "must actually read the warrant and satisfy themselves that they understand its scope and limitations, and that it is not defective in some obvious way." Id.; see also United States v. Leon, 468 U.S. 897, 922–23 (1984) (search pursuant to a warrant is invalid if no reasonable officer could have believed the warrant was valid).

        "Line officers," or the officers who conduct but do not lead the search, are required to do much less. "They do not have to actually read or even see the warrant; they may accept the word of their superiors that they have a warrant and that it is valid." Ramirez, 298 F.3d at 1028 (citing Guerra v. Sutton, 783 F.2d 1371, 1375 (9th Cir. 1986); Marks v. Clarke, 102 F.3d 1012, 1029–30 (9th Cir. 1996)). So long as the participating officers "ma[k]e inquiry as to the nature and scope of [the] warrant," Guerra, 783 F.2d at 1375, their reliance on leaders' representations about it is reasonable. Id.

        Here, counsel for Defendants stated during the hearing on the instant motions that Officer Bigoss was the leader of the raid on Plaintiffs' home. Nevertheless, it appears that Sergeant Perkett likewise acted in some leadership capacity during the

raid, as Perkett has stated that he was the one who gave the order to the other officers to cease the search once he realized they were at the wrong house. (See Opp'n Ex. 8 at 2; Mot. Ex. D at 3-4.) The remaining officers who participated in the raid appear to have acted as line officers.

First, as to the line officers, the Court finds that they acted reasonably: they were told that a warrant had been obtained and learned through an advance briefing about the particulars of the warrant. (County Mot. at 4-5, 16; Officers' Mot. at 4-5, 15.) Because they were not required to read the warrant, the line officers conducting the search cannot reasonably have been expected to know that it may have been defective, or that Officer Bigoss may have acted unreasonably when conducting his investigation and drafting his description of the house to be searched. Further, the line officers would not have known, upon passing the posted address of Plaintiffs' house, that it did not match the address on the warrant, as there is no evidence that they read the warrant (nor were they required to do so). Accordingly, it appears that the line officers acted reasonably when they entered Plaintiffs' property and initiated the raid.

As to Sergeant Perkett, it is unclear from the record whether he read the warrant prior to leading the raid. Plaintiffs allege in their Second Amended Complaint that Perkett never

confirmed that the address of 323 Manini Place existed, and never "verified the warrant." (SAC ¶¶ 66, 68.) Defendants do not present any evidence indicating that Perkett read the warrant or otherwise did anything to satisfy himself that the warrant was valid. Further, Plaintiffs correctly point out that Sergeant Perkett participated in the initial investigation with Bigoss, and was present when the confidential information pointed out the target house and described it as brown with a bamboo fence. (See County Reply at 4.) Thus, had Perkett read the warrant, he might have identified the discrepancies between the warrant description and the description provided by the informant. As such, the Court concludes that there is at least a question of fact as to whether Sergeant Perkett acted reasonably in his capacity as one of the officers leading the search.

Finally, as to Officer Bigoss, as discussed above, there is at least a question of fact as to whether he made "a reasonable effort to ascertain and identify the place intended to be searched" as dictated by Garrison. See id. at 88-89. Further, he saw as he was entering Plaintiffs' property that the posted street address did not match the address on the search warrant. (See County Mot. Ex. 6 at 2.) In light of the discrepancies he knew already existed as to the target house's description and exact address (as discussed above), there is a question of fact as to whether he acted reasonably in his capacity as one of the

leaders of the search in allowing the search to go forward.

### c.   Reasonableness of the Duration of the Search

With respect to all of the individual officers,
Plaintiffs argue that they acted unreasonably by continuing the
search of Plaintiffs' house for almost 20 minutes, even after
some or all of the officers realized that they were at the wrong
house. (County Opp'n at 16-18; Officer Opp'n at 11-14.)
Defendants counter that the search ceased as soon as the officers
became aware of their mistake. (County Mot. at 6-8.) Even if some
of the officers' mistaken entry into Plaintiffs' home was
excused, as discussed above, there may still be an actionable
violation of Plaintiffs' Fourth Amendment rights if the search
continued after the error was realized.

The facts are clearly in dispute as to whether the
search ceased as soon as the officers in charge realized they
were at the wrong house. Officer Bigoss stated that approximately
30 seconds after arriving at his perimeter post on Plaintiffs'
lanai he realized that they were at the wrong house. (County
Opp'n Ex. 6 at 2.) Bigoss stated further that as soon as he
realized they were at the wrong house he notified Sergeant
Perkett of the mistake. (County Mot. Ex. X (Bigoss Depo.) at 38.)
Perkett and Bigoss claim that by the time they realized they were
at the wrong house, the house had already been cleared by the
officers, and that they immediately ordered the officers to

leave. (County Opp'n Ex. 8 at 2; Ex. 6 at 2.) Nevertheless,

Plaintiffs state (and Defendants concede for purposes of the

instant motions) that the search lasted at least 20 minutes,

indicating there was at least some period of time during which

the search continued even after Bigoss and Perkett realized their

mistake approximately 30 seconds after arriving at Plaintiff's

house. (County Opp'n at 6, Ex. 21 (Deposition of April Freeland)

at 46.)

         In light of this timing, there is at least a question

of fact as to whether Officers Bigoss and Perkett allowed the

search to continue even after they realized that they were at the

wrong house. Although police officers do not necessarily violate

the Fourth Amendment when they mistakenly execute a search

warrant on the wrong address, the officers are required to

immediately discontinue the search once they are put on notice

that they may be searching the wrong house. Garrison, 480 U.S. at

87. The Court cannot conclude as a matter of law that the

officers in charge immediately ceased the search once they

realized that they were at the wrong house. Plaintiffs have

therefore raised a triable issue of fact as to whether their

Fourth Amendment rights were violated as to Defendants Bigoss and

Perkett.

         As for the line officers, Plaintiffs point to evidence

suggesting that at least some of them suspected they might not be

25

at the correct house upon knocking on the door and seeing Plaintiffs, but that they nevertheless proceeded to enter and clear the house. For example, Officer Brown stated that, as soon as Plaintiffs answered the door and Brown saw the occupants and the interior of the house, he believed that it didn't look "like the house of 'Drug Dealers,'" and that "I don't think I was the only member to feel this but continued to execute the Search Warrant." (County Opp'n Ex. 10 at 1.) Similarly, Officer Dods stated that "[i]n my opinion, it appeared that the involved officers felt that something wasn't right after making entry into the residence," but that the officers continued to execute the warrant until "the residence was determined to be secure." (Id. Ex. 28 at 1-2.) Other officers made similar statements. (See County Opp'n at 14-15.)

As discussed above, however, the line officers did not act unreasonably in following their superiors' orders in executing the search warrant. See Ramirez, 298 F.3d at 1028. Further, the Court cannot conclude that the line officers knew or should have known that their conduct might result in the violation of Plaintiffs' rights simply because they observed that Plaintiffs did not match the description of the target. The line officers did not know at the time that there was any discrepancy with respect to the search warrant's description of the target residence, and did not know whether the target - Kimberly Uyeda -

was in fact in the house, notwithstanding the fact that she did not answer the door. Further, there is no evidence that, once the order to cease the search was given, any of the line officers nevertheless continued searching Plaintiffs' home. As such, the Court cannot conclude that the line officers acted unreasonably with respect to the duration of the search.

### 2.   Unlawful Seizure/Arrest

With respect to Defendants' detention of Plaintiffs during the search of their home, Plaintiffs bring separate claims for unlawful seizure and unlawful arrest under § 1983 (See SAC ¶¶ 115-124.) Because Plaintiffs do not appear to plead facts to support separate claims for unlawful arrest and unlawful seizure,[4] the Court will construe Counts 1 and 2 of Plaintiffs' Second Amended Complaint as a single claim against Defendants for the alleged unlawful detention, or seizure, of Plaintiffs during the police raid on their home. A person is "seized" when by means of physical force or a show of authority, his freedom of movement is restrained. United States v. Mendenhall, 446 U.S. 544, 553-54 (1980); see also Doe ex rel. Doe v. State of Hawaii Dept. of Education, 334 F.3d 906, 909 (9th Cir. 2003)(seizure, in

---

[4] "It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime -- 'arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry v. Ohio, 392 U.S. 1, 16 (1968).

constitutional sense, occurs "when there is a restraint on liberty to the degree that a reasonable person would not feel free to leave."). A seizure violates the Fourth Amendment if it is objectively unreasonable under the circumstances. <u>Doe</u>, 334 F.3d at 909. The determination of whether a seizure was reasonable requires a two-step inquiry: first, whether a seizure has occurred, and, if so, whether that seizure was objectively unreasonable under the circumstances. <u>Id.</u>

As to the first inquiry, whether a seizure occurred, the Supreme Court has stated that examples of circumstances that might indicate a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." <u>Mendenhall</u>, 446 U.S. at 554. Here, it does not appear that the parties dispute that there was a seizure. Plaintiffs state that they were forcibly taken outside of their home and "held . . . captive" on their lanai by officers with "combat type weapon[s]." (SAC ¶¶ 32-35.) Defendants concede that Plaintiffs were "asked to step outside of the house," but assert that no physical force was used, and that neither plaintiff was handcuffed. (Officers' Mot. at 5; County Mot. at 5-6.) Nevertheless, Defendants admit in their motions that Plaintiffs were "detained for a few minutes" until

Defendants realized that they were at the wrong house. (County Mot. at 12; Officers' Mot. at 11-12.) Thus, it is undisputed that Plaintiffs were detained by the officers and not free to leave for at least several minutes. The Court finds that a seizure occurred.

The Court next turns to an analysis of whether the seizure was reasonable. Supreme Court and Ninth Circuit precedents establish that, generally, the police may detain a building's occupants while officers execute a search warrant. Michigan v. Summers, 452 U.S. 692, 704-05 (1981) ("If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home."); Ganwich v. Knapp, 319 F.3d 1115, 1120 (9th Cir. 2003) (concluding that it was reasonable to detain a business's employees while officers searched the business's premises pursuant to a warrant). To determine whether a detention incident to a search is constitutionally reasonable, courts balance the law enforcement interests served by the detention against the public's privacy interests. Ganwich, 319 F.3d at 1120. Courts recognize that detaining a building's occupants during a search serves at least three law enforcement interests: first, it prevents a suspect from fleeing before the

police discover contraband; second, it minimizes the risk that an officer or an occupant might be harmed during the search; and third, it often expedites the search. Summers, 452 U.S. at 702-03; Ganwich, 319 F.3d at 1120.

Importantly, the Supreme Court recently held that "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" Muehler v. Mena, 544 U.S. 93 (2005). The Ninth Circuit has sated that, under Muehler, the duration of a detention may be coextensive with the period of a search, and require no further justification, so long as the detention is conducted in a reasonable manner. Dawson v. City of Seattle, 435 F.3d 1054, 1066 (9th Cir. 2006). Thus, it appears the MPD could detain Plaintiffs in a reasonable manner while Plaintiffs' residence was being searched, albeit mistakenly, pursuant to a warrant.

Plaintiffs nevertheless argue that the seizure was unreasonable because they were forcibly pulled out of their home, held on their lanai by armed men, and were not free to leave for "at least 20 minutes while the police searched their home." (County Opp'n at 17; Officer Opp'n at 15.) Defendants counter that Plaintiffs were only detained for "a few minutes" before the police officers realized that they were at the wrong house, that

no physical force was used against them, and that the detention

was reasonable in light of the commencement of the search.

(County Mot. at 12; Officers' Motion at 11-12.) In light of the

parties' differing allegations regarding the exact length and

nature of Plaintiffs' detention during the search, it appears

that issues of fact preclude a legal finding as to the

reasonableness of the seizure.

Because, as discussed above, Defendants Bigoss and

Perkett were the leaders of the search and thus had the authority

to end Plaintiffs' detention, the Court concludes there is a

question of fact as to whether Bigoss and Perkett violated

Plaintiffs' Fourth Amendment right to be free from unreasonable

seizure. Specifically, as discussed above, there is a question of

fact as to whether Bigoss and Perkett ordered the line officers

to cease the detention as soon as they realized they were at the

wrong house, or whether some amount of time elapsed before they

gave the order to release Plaintiffs. As to the remaining line

officers, because, as discussed above, there is no evidence that

they continued the search or detention once the order to cease

was given, the Court cannot conclude that they acted unreasonably

in their participation in Plaintiffs' detention.

### 3.   **Excessive Force**

In their motions, Defendants suggest that Plaintiffs'

seizure claim should be construed as an "inartful attempt" to

allege a claim for excessive force. (County Mot. at 10.)
Plaintiffs do not make a claim for excessive force in the Second
Amended Complaint, but nevertheless stated at the hearing on the
instant motions that the Second Amended Complaint could be
interpreted as making such a claim. As such, the Court addresses
Plaintiffs' claim for excessive force here.

        The Fourth Amendment, which protects against excessive
force in the course of a seizure, requires that courts examine
the objective reasonableness of a particular use of force to
determine whether it was indeed excessive. Graham, 490 U.S. at
394-95, 398; see also Maxwell v. Cnty. of San Diego, 697 F.3d
941, 951 (9th Cir. 2012). To assess objective reasonableness,
courts weigh "the nature and quality of the intrusion on the
individual's Fourth Amendment interests against the
countervailing governmental interests at stake." Graham, 490 U.S.
at 396 (citation and internal quotation marks omitted). Stated
another way, the Court must "balance the amount of force applied
against the need for that force." Meredith v. Erath, 342 F.3d
1057, 1061 (9th Cir. 2003).

        First, the Court must analyze the type and amount of
force that Defendants used against Plaintiffs during the raid.
Plaintiffs claim that Defendants grabbed them by their wrists,
pulled them out of their home, pushed them onto a couch on their
lanai, and held them captive during the search. (County Opp'n at

5, Exs. 1 & 2; SAC ¶¶ 32-34.) Plaintiffs do not, however, allege that they suffered any physical injury or required medical treatment as a result of Defendants' actions. (See County Opp'n Ex. 1 at 6; Ex. 2 at 2.) Further, Plaintiffs have stated that the officers never pointed their weapons at Plaintiffs. (County Mot. Ex. MM (Deposition of April Freeland) at 40.) As such, the Court concludes that the nature and quality of the force used was relatively minimal.

Next, as to the governmental interests at stake, Graham provides a non-exhaustive list of factors to consider, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. In the case of force used to effectuate a search, the Supreme Court has stated that "[i]nherent in [officers'] authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." Muehler, 544 U.S. at 98-99. The Meuhler Court further explained that "the risk of harm to officers and occupants is minimized if the officers routinely exercise unquestioned command of the situation." Id. at 99 (internal quotation marks omitted). Defendants were therefore constitutionally permitted to use some amount of reasonable force to detain Plaintiffs while conducting the search.

Here, viewing the facts in the light most favorable to
Plaintiffs, the physical force used on Plaintiffs was minimal at
most. In Muehler, the Supreme Court found that the handcuffing of
plaintiffs for two to three hours while the officers conducted a
search of their home was a "marginal intrusion" outweighed by the
interests of the officers in effectuating the search. Id. Here,
Plaintiffs were not handcuffed and did not suffer any physical
injury as a result of Defendants' actions. Further, Plaintiffs
state that they were detained for, at the most, 20 minutes. As
such, in light of the minimum force used on Plaintiffs and the
legitimate government interest of keeping the officers and
occupants safe during the search, the Court cannot conclude that
Defendants used unreasonable or excessive force in the instant
case.

In sum, the Court concludes that Plaintiffs have raised
issues of fact as to whether Defendants Bigoss and Perkett
violated Plaintiffs' Fourth Amendment rights to be free from
unreasonable search and seizure. Specifically, there are
questions of fact as to: (1) whether Officer Bigoss acted
unreasonably in investigating and drafting the warrant affidavit,
(2) whether Officers Bigoss and Perkett acted unreasonably as the
leaders of the raid in initiating the search, (3) whether
Officers Bigoss and Perkett acted unreasonably in allowing the
search to continue even after they realized they may be at the

34

wrong residence, and (4) whether Officers Bigoss and Perkett acted unreasonably in detaining Plaintiffs during the raid. As to the remaining individual officers, the Court finds that they did not act unreasonably and therefore Plaintiffs have not shown that they violated Plaintiffs' Fourth Amendment rights.

The motions are therefore DENIED with respect to Plaintiffs federal claims against Officers Bigoss and Perkett, and GRANTED with respect to Plaintiffs' federal claims against all of the individual officers except Bigoss and Perkett.

**B.   Was the Applicable Law Regarding Fourth Amendment Searches and Seizures "Clearly Established" in 2011?**

Because the Court concludes that Plaintiffs have demonstrated that factual questions exist as to whether Officers Bigoss and Perkett violated their Fourth Amendment rights, the next step in the qualified immunity analysis is determining whether those rights were "clearly established," assessed "in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201. "Because the focus is on whether the officer[s] had fair notice that [their] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." Brosseau v. Haugen, 543 U.S. 194, 198 (2004). "If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." Id.

To be clearly established, the "contours" of an asserted constitutional right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). This does not mean that a court must have previously found the very action in question unlawful, but it does mean that "in the light of pre-existing law the unlawfulness must be apparent." Id. In determining whether a constitutional violation is clearly established, the Court construes the facts in the light most favorable to Plaintiffs as the non-moving party. Scott v. Harris, 550 U.S. 372, 378-80 (2007).

Here, the Court finds that the rights involved were "clearly established." "No reasonable officer could claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional." Groh, 540 U.S. at 564 (citing Payton v. New York, 445 U.S. 573, 586 (1980)). Further, the particular "contours" of Fourth Amendment law involved here - the requirement that an officer act reasonably in describing with particularity the premises to be searched, the requirement that a detention during a search be reasonable, and the requirement that a search be terminated once a mistake is realized - were all also well established when the raid took place in 2011. Indeed, Maryland v. Garrison, the primary Supreme Court case analyzing

36

the issue of a mistaken search conducted pursuant to a warrant
was published in 1987. See Ashcroft v. Al-Kidd, 131 S.Ct. 2074,
(2011) (stating that, for a finding that a right is clearly
established, "[w]e do not require a case directly on point, but
existing precedent must have placed the statutory or
constitutional question beyond debate."). As such, Defendants
Bigoss and Perkett were on reasonable notice that their actions
in allowing the search and detention to continue even after
realizing they were at the wrong house violated the Fourth
Amendment. Further, Officer Bigoss was on notice that his actions
in failing to make a reasonable investigation and description of
the target house to avoid search of the wrong house was likewise
violative of the Fourth Amendment. The Court therefore finds that
the constitutional rights Plaintiffs allege were violated were
"clearly established" on April 15, 2011, the night of the
mistaken raid on their home.

     In sum, the Court concludes that Plaintiffs have
demonstrated genuine issues of material fact as to whether
Defendants Bigoss and Perkett acted unreasonably and thus
violated their clearly established Fourth Amendment rights. The
Court therefore DENIES the County Motion insofar as the Court
concludes that Officers Bigoss and Perkett are not entitled to
qualified immunity. Because the Court finds that the other named
individual officers acted reasonably and did not violate

Plaintiffs' clearly established Fourth Amendment rights, the
Court GRANTS the Officers' Motion and DISMISSES WITHOUT PREJUDICE
Plaintiffs' federal claims against those defendants.

### C.   The County and Chief Yabuta

In addition to their claims against the individual
officers who participated in the raid, Plaintiffs also bring
§ 1983 claims against the County of Maui and Chief Yabuta for
failure to adequately supervise. Defendants argue that
Plaintiffs' § 1983 claims against the County of Maui and Chief
Yabuta must be dismissed because Plaintiffs cannot show that the
allegedly unreasonable search and seizure were undertaken
pursuant to county policy or custom, or that Chief Yabuta
expressly ratified the allegedly unconstitutional conduct.
(County Mot. at 17-19; County Reply at 6-12.)

Municipal liability under 42 U.S.C. § 1983 "can only be
imposed for injuries inflicted pursuant to an official government
policy or custom." Davis v. City of Ellensburg, 869 F.2d 1230,
1233 (9th Cir. 1989). A "policy" is a "deliberate choice to
follow a course of action made from among various alternatives by
the official or officials responsible for establishing final
policy with respect to the subject matter in question." Young v.
City of Visalia, 687 F. Supp. 2d 1141, 1147 (E.D. Cal. 2009). "A
'custom' for purposes of municipal liability is a 'widespread
practice that, although not authorized by written law or express

municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." Id.

"Absent a formal governmental policy, [Plaintiffs] must show a 'longstanding practice or custom which constitutes the standard operating procedure of the local government entity.'" Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996). The policy or custom "must be so persistent and widespread that it constitutes a permanent and well settled city policy." Id. Liability for improper policy or custom "may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Id.

Here, Plaintiffs appear to be attempting to satisfy their burden of showing such a policy or custom by relying on a "failure to train" theory - i.e., that MPD officers received insufficient training in the supervision and execution of warrants. In order to succeed under such a theory in the § 1983 context, Plaintiffs' evidence must address the following three factors:

> First, it must be determined whether the existing training program is adequate. The adequacy of a particular training program must be resolved "in relation to the tasks the particular officers must perform." A training program will be deemed adequate if it "enables officers to respond properly to the usual and recurring situations with which they must deal."
>
> Second, if the training program is deemed

39

> inadequate, it may justifiably be said to
> constitute a city policy. Such will be the case,
> however, "only where the failure to train amounts
> to deliberate indifference to the rights of
> persons with whom the police come into contact."
> This heightened degree of culpability on the party
> [sic] of a municipality may be established when
> "the need for more or different training is so
> obvious, and the inadequacy so likely to result in
> the violation of constitutional rights, that the
> policymakers of the city can reasonably be said to
> have been deliberately indifferent to the need."
>
> Finally, inadequate training that manifests
> deliberate indifference on the part of a
> municipality must be shown to have "actually
> caused" the constitutional deprivation at issue.

Merritt v. Cnty. of Los Angeles, 875 F.2d 765, 770 (9th Cir.

1989) (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 391–

92 (1989)). Only if all three factors are proven can a

municipality's training program be actionable under § 1983.

In light of the above standard, Plaintiffs' § 1983

claims against the County of Maui must fail. Defendants state,

and Plaintiffs do not dispute, that the mistaken execution of a

warrant in this case represents a single, isolated incident.

(County Mot. Ex. A (Declaration of Gary Yabuta ("Yabuta Decl."))

at ¶ 10.) Given this uncontested fact, the County cannot be said

to have been on notice of any deficiencies in its training of

police officers in the execution of warrants. Municipal liability

therefore cannot attach as a matter of law. "Only where a failure

to train reflects a deliberate or conscious choice by the

municipality . . . can a city be liable for such a failure under

§ 1983." <u>City of Canton, Ohio</u>, 489 U.S. at 389; <u>see also</u> <u>Connick</u> <u>v. Thompson</u>, 131 U.S. 1350, 1360 (2011) ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train.").

As to Chief Yabuta, Plaintiffs appear to be arguing that he "ratified" the officers' allegedly unconstitutional actions, and may therefore be held liable under § 1983. (County Opp'n at 21.) First, even assuming that Yabuta did "ratify" the individual officers' actions after the fact, Plaintiffs cannot show that his ratification was the cause of the alleged constitutional violations. <u>See</u> <u>Williams v. Elliqton</u>, 936 F.2d 881, 884-85 (6th Cir. 1991) (noting that <u>Monell v. Dept. of</u> <u>Social Services of New York</u>, 436 U.S. 658 (1978) requires a causal connection between the municipal "policy" and the constitutional deprivation, and that a single instance of ratification after the fact was insufficient to constitute the "moving force" behind the alleged constitutional deprivation). As discussed above, Plaintiffs have not produced evidence of any other unconstitutional, mistaken searches conducted by the MPD, or other instances of Chief Yabuta ratifying such conduct.

Second, Plaintiffs have not demonstrated that Yabuta actually ratified the unconstitutional conduct here. The Ninth Circuit has found municipal liability on the basis of

ratification when the officials involved "adopted and expressly approved of the acts of others who caused the constitutional violation." <u>Trevino v. Gates</u>, 99 F.3d 911, 920 (9th Cir. 1996). Here, it is undisputed that Officer Bigoss was disciplined for the mistaken search of Plaintiffs' home. (<u>See</u> County Opp'n at 9; County Reply at 8.) Accordingly, Plaintiffs have not demonstrated that Chief Yabuta "adopted and expressly approved of" Bigoss's conduct, or the unconstitutional raid itself.[5] See <u>Haugen v. Brosseau</u>, 339 F.3d 857, 875 (9th Cir. 2003), <u>rev'd on other grounds by</u> <u>Brosseau v. Haugen</u>, 543 U.S. 194 (2004) (stating that a plaintiff must show that a decision was the product of a conscious, affirmative choice to ratify the conduct in question). The Court therefore cannot conclude that Chief Yabuta or the County of Maui are subject to municipal liability for the actions of the individual officers in conducting the allegedly unconstitutional raid.

As such, the Court GRANTS the County Motion to the extent it seeks summary judgment as to Plaintiffs' federal claims

_____

[5] While it is somewhat unclear from their pleadings, Plaintiffs also possibly argue that Yabuta is subject to supervisor liability in his individual capacity. (<u>See</u> County Opp'n at 21.) This claim must also fail, however, because Plaintiffs have failed to demonstrate that Yabuta "participated in or directed . . . or knew of . . . and failed to prevent . . ." the unconstitutional search of Plaintiffs' home. <u>See</u> <u>Corales v. Bennett</u>, 567 F.3d 554, 570 (9th Cir. 2009). Indeed, there appears to be no evidence that Yabuta participated in or knew of the raid prior to its execution.

against the County of Maui and Defendant Yabuta. Plaintiffs'
§ 1983 claims against the County of Maui and Chief Yabuta are
DISMISSED WITHOUT PREJUDICE.

## II. **The State Law Claims**

In addition to their federal claims, Plaintiffs bring
the following claims under Hawaii state law: (1) false arrest,
(2) assault and battery, (3) intentional infliction of emotional
distress, (4) negligent infliction of emotional distress, (5)
trespass, (6) gross negligence, (7) respondeat superior liability
as against Chief Yabuta and the County of Maui, (8) negligent
training/supervision as against Chief Yabuta and the County, and
(9) negligence as against all Defendants.

### A. **Qualified/Conditional Privilege**

Defendants argue that all of Plaintiffs' state law
claims must be dismissed because the individual officers are
shielded from liability by the qualified or conditional
privilege.[6]

Under the doctrine of conditional or qualified
privilege, nonjudicial government officials are shielded from
liability for their tortious actions committed during the
performance of their public duties. See Long v. Yomes, Civ. No.
11-00136, 2011 WL 4412847 at *6 (D. Haw. 2011). In order for a

---

[6] Plaintiffs do not address in their oppositions Defendants'
arguments regarding conditional privilege.

plaintiff to prevail in a state tort action against a nonjudicial government official, the plaintiff must "allege and demonstrate by clear and convincing proof that the official was motivated by malice and not by an otherwise proper purpose." Id. (quoting Edenfield v. Estate of Willets, Civ. No. 05-00418, 2006 WL 1041724 at *11-12 (D. Haw. 2006)).

For claims other than defamation, courts employ an "actual malice" test. Bartolome v. Kashimoto, Civ. No. 06-00176 BMK, 2009 WL 1956278, at *1 (June 26, 2009). Under this test, "malice" is defined as "the intent, without justification or excuse, to commit a wrongful act[,] reckless disregard of the law or of a person's legal rights[,] and [i]ll will; wickedness of heart." Id. (quoting Awakuni v. Awana, 165 P.3d 1027, 1041 (Haw. 2007)) (internal quotation marks omitted). The Court notes that Awakuni established the definition of malice based on the definitions contained in the eighth edition of Black's Law Dictionary. Black's Law Dictionary contains three definitions of malice: "1. The intent, without justification or excuse, to commit a wrongful act. 2. Reckless disregard of the law or of a person's legal rights. 3. Ill will; wickedness of heart." Black's Law Dictionary (8th ed. 2004). It thus appears that, in accordance with the Hawaii Supreme Court's ruling in Awakuni, a plaintiff may show malice by satisfying any one of the three definitions. See Awakuni, 165 P.3d at 1043 (concluding that

44

plaintiffs failed to show that defendants "were motivated by ill will or an intention to commit, or a reckless disregard of committing, a wrongful act against any of the [plaintiffs.]" (emphasis added)).

In this case, as to the individual line officers, Plaintiffs make no arguments in their oppositions as to malice, and raise no evidence in their filings on the instant motions to support a finding of malice. While Plaintiffs have introduced several of the officers' statements that they noted that Plaintiffs did not match the description of the target in the warrant, or that Plaintiffs' house did not look like a "drug house," as discussed above, there is simply no evidence that the line officers were motivated by anything other than the necessity of following their superiors' orders in executing what they believed was a valid search warrant describing Plaintiffs' home. As such, Plaintiffs have failed to demonstrate that the individual line officers who conducted the search were motivated by malice or an otherwise improper purpose when they executed the raid on Plaintiffs' home. See id. at 1041. The individual line officers are therefore entitled to the qualified or conditional privilege. Plaintiffs' state law claims, namely Counts 6 through 16, are DISMISSED WITHOUT PREJUDICE as to all of the individual line officer defendants except Officers Bigoss and Perkett.

As to Officers Bigoss and Perkett, as discussed above,

45

Plaintiffs state that the search of their home lasted 20 minutes, (see County Opp'n Ex. 21), while Officer Bigoss has stated that he realized within 30 seconds of arriving at Plaintiff's house that the officers were at the wrong house, and told Perkett right away. (See County Opp'n Ex. 6.) In light of these conflicting statements, there is at least a question of fact as to whether Officers Perkett and Bigoss allowed the search to continue even after they realized that they were at the wrong house. To the extent they did so, a reasonable jury may find that this constituted a "reckless disregard of the law or of [Plaintiffs'] legal rights." See Awakuni, 165 P.3d at 1043. As such, the Court finds that there is at least a question of fact as to whether Officers Bigoss and Perkett acted with malice. They are therefore ineligible for the qualified/conditional privilege. The Court therefore turns to an analysis of Plaintiffs' state law claims as against Officers Perkett and Bigoss.

### B.   False Arrest

Under Hawaii tort law, to maintain an action for false arrest or false imprisonment a plaintiff must show (1) the detention or restraint of one against one's will, and (2) the unlawfulness of such detention or restraint. Reed v. City and Cnty. of Honolulu, 76 Haw. 219, 230 (1994) (quoting Meyer v. City & Cnty. of Honolulu, 6 Haw. App. 505, 508, 729 P.2d 388, 391, rev'd on other grounds, 69 Haw. 8, 731 P.2d 149 (1986)). Probable

46

cause is an affirmative defense to the claim of false
imprisonment. Id. As discussed above, it appears to be undisputed
that Plaintiffs were detained against their will during the raid.
(See SAC ¶¶ 32-25; County Mot. at 5-6; Officers' Mot. at 5.)
Further, as discussed above, Plaintiffs have at least raised a
question of fact as to whether the detention was lawful: to the
extent Officers Bigoss and Perkett failed to halt the search and
allowed Plaintiffs' detention to continue even after they
realized that they were at the wrong house, they may have acted
unlawfully. As such, the Court finds that a question of fact
exists as to whether Officers Bigoss and Perkett may be liable
under state law for false arrest.

### C.   Assault and Battery

Under Hawaii law, a person commits the common law tort
of assault "if he or she acts with intent to cause another a
nonconsensual harmful or offensive contact or apprehension
thereof, and the other person apprehends imminent contact."
Mukaida v. Hawaii, 159 F. Supp. 2d 1211, 1223 (D. Haw. 2001). A
person commits the common law tort of battery "if he or she acts
with intent to cause a nonconsensual harmful or offensive
contact, or apprehension thereof, and the contact occurs." Id.
See also Williams v. Aona, 121 Haw. 1, 13 (2009) ("[A] defendant
causes battery when he or she intentionally causes bodily contact
to the plaintiff in a way not justified by the plaintiff's

apparent wishes or by a privilege, and the contact is in fact harmful or against the plaintiff's will." (internal quotation marks omitted)).

Here, Plaintiffs argue that one or some of the Defendants forcibly pulled them out of their home, and that the reaching toward Plaintiffs and touching of Plaintiffs by pulling them outside constituted common law assault and battery, respectively. (See County Opp'n at 23.) Defendants counter that the officers were entitled to use such force as was reasonable in the effectuation of the search. (County Mot. at 23 (citing Muehler, 544 U.S. at 98-99).) As this Court stated above, all of the individual officers except Officers Bigoss and Perkett are entitled to the qualified/conditional privilege and are thus shielded from liability as to Plaintiffs' state law claims. Thus, the Court need only analyze whether Officers Bigoss and Perkett may be held liable for common law assault and battery.

As to Officers Bigoss and Perkett, there is no evidence that either of them actually intended to or did physically touch the Plaintiffs during the raid. Plaintiffs do not identify which of the individual Defendants allegedly pulled them out of their home, and the Court has evidence before it that neither Officer Bigoss nor Sergeant Perkett was assigned to the entry team, and that both Bigoss and Perkett were assigned to exterior perimeter posts. (See County Opp'n at 24; Ex. 8 at 2; Ex. 6 at 2.) The

48

Court therefore concludes that there is no evidence to support Plaintiffs' claims of assault and battery as against Defendants Bigoss and Perkett. Plaintiffs' state law claims for assault and battery are therefore DISMISSED WITHOUT PREJUDICE.

### D.    Intentional Infliction of Emotional Distress

The elements of the tort of intentional infliction of emotional distress (IIED) are: "1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress to another." Hac v. Univ. of Hawaii, 102 Haw. 92, 106-07, 73 P.3d 46, 60-61 (2003).

To demonstrate the first element, a plaintiff must show that the defendant acted either with a "desire to inflict severe emotional distress, . . . where he knows that such distress is certain, or substantially certain, to result from his conduct" or "recklessly . . . in deliberate disregard of a high degree of probability that the emotional distress will follow." Ritchie v. Wahiawa General Hosp., 597 F. Supp. 2d 1100, 1110 (citing Restatement (Second) Torts Section 46, cmt. i (1965)). Recklessness, unlike negligence, involves more than "inadvertence, incompetence, unskillfulness, or a failure to take precautions," but instead rises to the level of a "conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it." Id.; see also Iddings v.

49

Mee-Lee, 82 Hawaii 1, 11, 919 P.2d 263, 273 (1996) ("The usual
meaning assigned to . . . 'reckless,' . . . is that the actor has
intentionally done an act of an unreasonable character in
disregard of a risk known to or so obvious that he . . . must be
taken to have been aware of it, and so great as to make it highly
probable that harm would follow.").

Here, viewing the record in the light most favorable to
Plaintiffs, there is at least a question of fact as to whether
Defendants Bigoss and Perkett acted recklessly in allegedly
allowing the search to continue for 20 minutes, even after they
realized that they were at the wrong house. In light of this
factual dispute, the Court cannot conclude as a matter of law
that Bigoss and Perkett did not make a "conscious choice of a
course of action . . . with knowledge of the serious danger to
others involved in it." See Restatement (Second) Torts, § 500,
cmt. g. The first factor is therefore satisfied.

With respect to the second factor, "outrageous"
conduct:

> Liability has been found only where the conduct
> has been so outrageous in character, and so
> extreme in degree, as to go beyond all possible
> bounds of decency, and to be regarded as
> atrocious, and utterly intolerable in a civilized
> community. Generally, the case is one in which the
> recitation of the facts to an average member of
> the community would arouse his resentment against
> the actor, and lead him to exclaim, "Outrageous!"

Ross v. Stouffer Hotel Co., 76 Hawaii 454, 465 n. 12 (1994)

(citation and quotation marks omitted); see also Shoppe v. Gucci Am., Inc., 94 Haw. 368, 387, 14 P.3d 1049, 1068 (2000) (stating that an act is outrageous if it is "without just cause or excuse and beyond all bounds of decency").

Here, Defendants Bigoss and Perkett have not established that their acts were not outrageous as a matter of law. Were a jury to find that Officers Bigoss and Perkett did, in fact, allow the search to continue even after realizing that they were at the wrong house, a reasonable fact finder could certainly find that the recitation of these facts to an average member of the community would arouse his sentiment against the officers and lead him to exclaim, "Outrageous!" See id.; Ross, 76 Hawaii at 465 n. 12. As such, the second factor is satisfied.

As to the final factor, extreme or severe emotional distress is defined as "mental suffering, mental anguish, mental or nervous shock[,] includ[ing] horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea." Hac, 102 Haw. at 106 (citation and quotation marks omitted); Enoka v. AIG Hawai'i Ins. Co., 109 Haw. 537, 559, 128 P.3d 850, 872 (2006) ("'[E]xtreme emotional distress' constitutes, inter alia, mental suffering, mental anguish, nervous shock, and other 'highly unpleasant mental reactions.'"). "The intensity and the duration of the distress are factors to [be] considered in determining its severity," and "bodily injury

51

. . . is not necessary to establish severe emotional distress."
Hac, 102 Haw. at 106.

In the instant case, with respect to Mrs. Freeland's
emotional distress, Plaintiffs proffer evidence that she had a
"flashback" of the night of the raid about two or three months
after the incident, and that she is concerned it may happen again
and is therefore afraid to use headphones. She states that she is
"still very upset." (County Mot. Ex. OO (Deposition of April
Freeland) at 121-22.) With respect to Mr. Freeland, he states
that he is "still very anxious" and that he "still lose[s] sleep"
every night over the incident. (County Mot. Ex. PP (Deposition of
Norman Freeman) at 78-79.) In light of these statements, the
Court concludes that there is at least a question of fact as to
whether Plaintiffs have suffered severe or extreme emotional
distress. Accordingly, the County Motion is DENIED to the extent
Defendants seek summary judgment as to Plaintiffs' state law
claim of IIED against Officers Bigoss and Perkett.

### E.   Negligent Infliction of Emotional Distress

The Supreme Court of Hawaii has determined that

a plaintiff may recover for negligent infliction
of emotional distress [NIED], absent any physical
manifestation of his or her psychological injury
or actual physical presence within a zone of
danger, where a reasonable person, normally
constituted, would be unable to adequately cope
with the mental stress engendered by the
circumstances of the case . . . . Thus, an NIED
claim is nothing more than a negligence claim in
which the alleged actual injury is wholly psychic

and is analyzed utilizing ordinary negligence principles.

Doe Parents No. 1 v. State, Dep't of Educ., 58 P.3d 545, 580 (Haw. 2002) (internal quotation marks and alterations omitted) (quoting Rodrigues v. State, 472 P.2d 156, 173 (Haw. 1970)).

Where the alleged injury is for psychological distress alone, "there is a need to strike a balance between avoiding the trivial or fraudulent claims that have been thought to be inevitable due to the subjective nature of such injury, on the one hand, and promoting the underlying purpose of negligence law, i.e., compensating persons who have sustained emotional injuries attributable to the wrongful conduct of others, on the other." Doe Parents No. 1, 58 P.3d at 579 (internal quotation marks and alterations omitted). The Supreme Court of Hawaii has, therefore, "consistently held, as a general matter, that the plaintiff must establish some predicate injury either to property or to another person in order himself or herself to recover for negligently inflicted emotional distress." Id. at 580; see also Kaho'ohanohano v. Dep't of Human Svs., State of Haw., 117 Haw. 262, 307 (2008). The foregoing principle was modified by Haw. Rev. Stat. § 663-8.9, which requires a predicate physical injury to the NIED claimant before he or she may recover damages for negligent infliction of emotional distress, where he or she claims that the psychological distress arises solely out of damage to property or to material objects. In sum, "the law as it

currently stands in Hawaii is that an NIED claimant must establish, incident to his or her burden of proving actual injury . . . that someone was physically injured by the defendant's conduct, be it the plaintiff himself or herself or someone else." Doe Parents No. 1, 58 P.3d at 580-81.

The Supreme Court of Hawaii has recognized, however, that there are certain cases that "present unique circumstances, which provide the requisite assurance that the plaintiff's psychological distress is trustworthy and genuine, [wherein the Court has] not hesitated to carve out exceptions to [the] general rule that recovery for psychic injury standing alone is permitted only where there is a predicate physical injury to someone, be it a plaintiff or a third person." Id. at 581 (internal quotation marks and alterations omitted). Thus, the Court has allowed NIED claims to go forward where a plaintiff alleged actual exposure to HIV-positive blood absent any predicate physical harm. See John & Jane Roes, 1-100 v. FHP, Inc., 985 P.2d 661 667-68 (Haw. 1999). The Court has also allowed NIED claims in cases involving the mishandling of a corpse. See Guth v. Freeland, 28 P.3d 982, 989 (Haw. 2001) (adopting the "minority view," under which the plaintiff claiming that the defendant was negligent in the course of preparing the body of an immediate family member for funeral, burial, or crematory purposes, could recover for emotional distress standing alone, without establishing that his or her

54

"emotional distress [had] manifest[ed] itself in a physical injury"). Finally, the Court has also allowed NIED claims absent evidence of physical injury "where a school negligently plac[es] a child in an environment where he or she is left unsupervised with an accused child molester, without undertaking any reasonable effort to ascertain where it can be anticipated that the accused will molest again." Doe Parents No. 1, 58 P.3d at 582.

The instant case does not fall under one of these three exceptions to the general rule that a plaintiff must demonstrate a predicate injury to him or herself or to another in order to bring a claim for NIED. Further, Plaintiffs do not argue that this case similarly presents "unique circumstances" tending to demonstrate the genuineness of their psychic harm. Indeed, Plaintiffs concede the general rule requiring a predicate injury, but claim that they have "suffered the predicate injury to their property . . . ." (County Opp'n at 25.) Defendants correctly note, however, that Plaintiffs have previously admitted that their property was not damaged during the raid. (See County Mot. Exs. O & P.) Further, even if Plaintiffs did suffer some damage to property, under Hawaii law Plaintiffs cannot recover in NIED for damage to their property unless they can also show that their emotional distress resulted in a physical injury or mental illness. Haw. Rev. Stat. § 663-8.9(a). Plaintiffs do not,

however, claim that they or anyone else suffered a physical injury or mental illness as a result of the raid. As such, Plaintiffs' claims for negligent infliction of emotional distress must fail. Count 10 of Plaintiffs' Second Amended Complaint is therefore DISMISSED WITHOUT PREJUDICE.

### F.   **Trespass**

A trespass occurs when a person "intentionally (a) enters land in the possession of the other, or causes a thing or third person to do so, or (b) remains on the land, or (c) fails to remove from the land a thing which he is under a duty to remove." Restatement (Second) of Torts § 158. With respect to Defendants Bigoss and Perkett, as discussed at length above, there is a question of fact as to whether they remained on Plaintiffs' property and allowed the search to continue even after they realized that they were at the wrong house. As such, the Court cannot conclude as a matter of law that Officers Bigoss and Perkett did not intentionally remain on Plaintiffs' property without the legal authority to do so.

### G.   **Negligence and Gross Negligence**

In order to succeed on a claim for negligence, a party must show:

> 1. A duty, or obligation, recognized by the law, requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks;
>
> 2. A failure on [the defendant's part] to conform

56

to the standard required;

3. A reasonable close causal connection between the conduct and the resulting injury; [and]

4. Actual loss or damage resulting to the interests of another.

White v. Sabatino, 415 F. Supp. 2d 1163, 1173 (D. Haw. 2006)

(citing Ono v. Applegate, 62 Haw. 131, 137, 612 P.2d 533, 538

(1980)).

"In order to succeed on a claim for gross negligence a party must show 'that there has been an 'entire want of care' which raises a presumption of 'conscious indifference to consequences.'" Smallwood v. NCsoft Corp., 730 F. Supp. 2d 1213, 1234 (D. Haw. 2010) (quoting Mullaney v. Hilton Hotels Corp., 634 F. Supp. 2d 1130, 1154 (D. Haw. 2009)). Gross negligence "is simply a point on a continuum of probability, and its presence depends on the particular circumstance of each case." Royal Ins. Co. of Am. v. Sw. Marine, 194 F.3d 1009, 1015 (9th Cir. 1999) (internal citation and quotation omitted); Pancakes of Haw., Inc. v. Pomare Props. Corp., 85 Haw. 286, 293, 944 P.2d 83, 90 (Haw. App. 1997) ("The element of culpability that characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence." (internal citation and quotation omitted)).

As to Officer Bigoss, as discussed above, despite ample evidence that the target residence was brown, he described the

target residence in the warrant affidavit as "off-white to gray
in color with red trim." (County Opp'n at 13-14, Ex. 5 (Search
Warrant No. 11-1-0088).) He did not conduct any further
investigation to ensure he was describing the correct house in
the warrant affidavit, despite the fact that his Google Maps
search revealed that 323 Manini Place did not exist. (Bigoss Dep.
at 25-26.) Further, Officer Bigoss has stated that he noticed as
he was passing Plaintiffs' mailbox and exterior gate that the
posted address was 237 Manini Place and did not match the address
in the warrant. (County Opp'n Ex. 6 at 2.) Yet, again, he failed
to take any reasonable measures to ensure he was at the correct
house.  Additionally, as to both Defendants Bigoss and Perkett,
as discussed above, there is a question of fact as to whether
they allowed the search to continue even after they realized that
they were at the wrong house. The Court concludes that this
conduct, if established, is sufficient to establish that Bigoss
and Perkett failed to meet their legally required standard of
care and acted with reckless indifference to Plaintiffs' legal
rights. As such, there are questions of fact precluding summary
judgment on Plaintiffs' claims for negligence and gross
negligence against Officers Bigoss and Perkett.[7]

---

[7] In Long v. Yomes, this Court stated that, "while the
requirement that plaintiffs show actual malice to overcome the
'qualified or conditional privilege' is a significant obstacle,
it does not preclude negligence liability in all cases." 2011 WL
4412847, at *7 (D. Haw. Sept. 20, 2011). In particular, the court

Plaintiffs also appear to bring negligence and gross negligence claims against Chief Yabuta and the County of Maui, separate from their claims for liability based on a theory of respondeat superior. (See County Opp'n at 27.) Plaintiffs do not, however, appear to be alleging that Chief Yabuta participated in the raid or otherwise knew about it beforehand. Further, as discussed above, Plaintiffs do not dispute that the mistaken execution of a warrant in this case represents a single, isolated incident. (County Mot. Ex. A (Declaration of Gary Yabuta ("Yabuta Decl.")) at ¶ 10.) Given this uncontested fact, Chief Yabuta and the County cannot be said to have been on notice of any deficiencies in the training of police officers in the execution of warrants. Further, Plaintiffs have not introduced any evidence suggesting that there were, in fact, deficiencies in the training of the officers such that the County or Chief Yabuta might be found to have failed to exercise reasonable care in preventing mistaken searches. As discussed in more detail below, the County of Maui may be liable for the torts committed by the individual officers under a theory of respondeat superior; however, there is no evidence of direct negligence or gross negligence on the part

---

noted, conduct performed with "reckless disregard of the law or of a person's legal rights" may be negligent, even though negligent conduct often does not involve malice. Here, as discussed above, Plaintiffs have raised a question of fact as to whether Officers Bigoss and Perkett acted with reckless disregard of Plaintiffs' legal rights. Thus, Plaintiffs may also bring negligence claims against them.

of the County or Chief Yabuta. The Court therefore DISMISSES
WITHOUT PREJUDICE Plaintiffs' claims for negligence and gross
negligence as against the County of Maui and Chief Yabuta.

### H.   Negligent Training, Supervision, Management

In addition to their claims against the individual
officers, Plaintiffs bring claims against Chief Yabuta and the
County of Maui for negligent supervision, management, and
control. Importantly, however, under Hawaii law a claim for
negligent supervision "may only be found where an employee is
acting <u>outside</u> of the scope of his or her employment[.]" <u>Dairy
Rd. Partners v. Island Ins. Co., Ltd.</u>, 92 Haw. 398, 427 (2000)
(emphasis in original); <u>see also</u> <u>Wong-Leong v. Hawaiian Indep.
Refinery, Inc.</u>, 76 Haw. 433, 444-45 (1994) (adopting the test for
negligent supervision set forth in the Restatement (Second) of
Torts § 317, requiring that the employee be acting outside the
scope of his employment).

The parties do not appear to dispute that the
Defendants were acting within the scope of their employment and
under color of law when they conducted the mistaken raid on
Plaintiffs' home. Plaintiffs do not allege that any of the
Defendants were acting outside the scope of their employment, nor
do they set forth facts giving rise to such an inference. Indeed,
Plaintiffs admit in their oppositions and allege in the Second
Amended complaint that the officers were acting within the scope

60

of their employment as police officers. (<u>See</u> County Opp'n at 29;
SAC ¶¶ 4-17.) Plaintiffs' claim for negligent training,
supervision, management, and control is therefore DISMISSED
WITHOUT PREJUDICE.

### I.   Respondeat Superior Claims

Plaintiffs also allege that Chief Yabuta and the County
of Maui may be held liable for the torts of the officers based on
a theory of respondeat superior. "Under the theory of respondeat
superior, an employer may be liable for the negligent acts of its
employees that occur within the scope of their employment."
<u>Wong-Leong</u>, 76 Haw. at 438. To recover under the respondeat
superior theory, a plaintiff must establish: 1) a negligent act
of the employee (breach of a duty that is the legal cause of
plaintiff's injury); and 2) that the negligent act was within the
employee's scope of employment. <u>Henderson v. Professional
Coatings Corp.</u>, 72 Haw. 387, 391-92 (1991). Because the
individual line officers are all entitled to the
qualified/conditional privilege, respondeat superior liability
may only be based on the torts allegedly committed by the
remaining individual officer defendants, Officers Bigoss and
Perkett. <u>See</u> <u>Silva v. City and Cnty. of Honolulu</u>, 2013 WL 2420902
at *20 (D. Haw. May 31, 2013); <u>Reed v. City and Cnty. of
Honolulu</u>, 76 Haw. 219, 227 (Haw. 1994).

As an initial matter, the Court notes that Chief Yabuta

may not be held liable pursuant to a theory of respondeat superior because he is not the individual officers' "employer." The role of a police chief with respect to subordinate police officers is that of a managing co-employee, not an employer. Chief Yabuta cannot be held vicariously liable for the tortious conduct of his co-employees where he did not participate in or direct their conduct. See, e.g., Jones v. City of Los Angeles, 215 Cal. App. 2d 155, 158 (1963) (noting that a chief of police may not be held liable for the wrongful acts of subordinates not done at his discretion). The Court therefore GRANTS the County Motion insofar as it seeks summary judgment on Plaintiffs' claims of respondeat superior liability as against Chief Yabuta.

As to the County of Maui, as discussed above, the parties do not dispute that the Defendants were acting within the scope of their employment when they conducted the raid on Plaintiffs' home. (See County Mot. at 28-29; County Opp'n at 29.) Further, as discussed above, there is at least a question of fact as to whether Officers Bigoss and Perkett may be liable for the torts of false arrest, intentional infliction of emotional distress, trespass, negligence, and gross negligence. Because Bigoss and Perkett were acting within the scope of their employment when they allegedly committed the torts, the County of Maui may be held liable under a theory of respondeat superior, should Defendants Bigoss and Perkett be found to be liable for

those torts. See Wong-Leong, 76 Haw. at 438.

### III. **Punitive Damages**

Finally, Plaintiffs seek punitive damages as against all Defendants. As a preliminary matter, Defendants correctly point out that municipalities may not be held liable for punitive damages under either § 1983 or Hawaii state common law. See Newport v. Facts Concerts, Inc., 453 U.S. 247, 271 (1981) (stating that a municipality is immune from punitive damages under 42 U.S.C. § 1983); Lauer v. Young Men's Christian Assoc., 57 Haw. 390, 402 (1976) (stating that municipalities cannot be liable under common law for punitive or exemplary damages). As such, Plaintiffs' claim for punitive damages is DISMISSED WITH PREJUDICE as against the County of Maui.

As for Plaintiffs' claim for punitive damages against the individual officers, "[t]he standard for punitive damages under § 1983 mirrors the standard for punitive damages under common law tort cases." Dang v. Cross, 422 F.3d 800, 807 (9th Cir. 2005). According to the Hawaii Supreme Court:

> In order to recover punitive damages, "the plaintiff must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences."

Ass'n of Apartment Owners v. Venture 15, Inc., 167 P.3d 225, 297

(Haw. 2007).  Further, "the proper measurement of the amount of
punitive damages is the degree of the defendant's malice,
oppression, or gross negligence that forms the basis for
liability for punitive damages and the amount of money required
to punish the defendant." Ditto v. McCurdy, 98 Haw. 123, 131, 44
P.3d 274, 282 (2002) (citing Kang v. Harrington, 59 Haw. 652, 663
(1978)); see also Iddings v. Mee-Lee, 82 Hawaii 1, 9 (1996)
(noting that willful, wanton, or reckless conduct may support an
award of punitive damages).

       As discussed above, as to the individual line officers,
Plaintiffs make no arguments in their oppositions as to malice,
and raise no evidence in their filings on the instant motions to
support a finding of malice or "conscious indifference to
consequences." See Venture 15, 167 P.3d at 297. Indeed, there is
no evidence that the line officers were motivated by anything
other than the necessity of following their superiors' orders in
executing what they believed to be a valid search warrant
describing Plaintiffs' home. Plaintiffs have thus failed to
demonstrate that the individual line officers who conducted the
search acted wantonly, oppressively, or with malice such that
punitive damages may be recovered as against them. Plaintiffs'
claim for punitive damages against the individual line officers
is therefore DISMISSED WITHOUT PREJUDICE.

       As to Chief Yabuta, as discussed above, there is simply

64

no evidence that he either knew about the mistaken raid prior to its execution, or ratified any alleged unlawful acts after the fact. The Court therefore DISMISSES WITHOUT PREJUDICE Plaintiffs' claim for punitive damages as against Chief Yabuta.

Finally, as to Officers Bigoss and Perkett, as discussed above, there is a question of fact as to whether they allowed the search to continue even after they realized that they were at the wrong house. If they did, in fact, allow the search to continue knowing that they were at the wrong house, this might very well constitute the type of "willful misconduct" or "entire want of care" sufficient to support an award of punitive damages. See id.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the individual officers' motion, (Doc. No. 137), and GRANTS IN PART AND DENIES IN PART the motion filed by the County of Maui, Chief Yabuta, and Officers Bigoss and Perkett, (Doc. No. 135), as follows:

1)   As to Defendants Perkett and Bigoss, the Court GRANTS IN PART AND DENIES IN PART their motion for summary judgment, (Doc. No. 135). The Court GRANTS the motion as to Plaintiffs' official capacity claims against Bigoss and Perkett. The Court further GRANTS the motion as to Plaintiffs claims for state law assault and battery and negligent infliction of emotional

65

distress. Plaintiffs' state law claims against Officers Bigoss and Perkett for assault, battery, and negligent infliction of emotional distress are DISMISSED WITHOUT PREJUDICE. The Court DENIES the motion as to all of Plaintiffs' remaining claims against Defendants Bigoss and Perkett.

2)   As to the remaining individual officers, Defendants Calibuso, Santos, Dods, Gantala, Carroll, Dagulo, Wright, Brown, Bayle, Kealoha, Perreira, and Okamoto, the Court GRANTS their motion for summary judgment, (Doc. No. 137), in its entirety. All of Plaintiffs' claims against the remaining individual officers are DISMISSED WITHOUT PREJUDICE.

3)   As to Defendants the County of Maui and Chief Yabuta, the Court GRANTS IN PART AND DENIES IN PART their motion, (Doc. No. 135). The Court GRANTS the motion as to all of Plaintiffs' claims against Chief Yabuta. Plaintiffs' claims against Chief Yabuta are DISMISSED WITHOUT PREJUDICE. The Court further GRANTS the motion as to Plaintiffs' federal claims, Plaintiffs' state law claim for negligent training, and Plaintiffs' claim for punitive damages as against the County of Maui. These claims against the County of Maui are DISMISSED WITHOUT PREJUDICE. The Court DENIES the motion as to Plaintiffs' state law respondeat superior claim against the County of Maui based on the alleged torts committed by Officers Bigoss and Perkett.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, December 11, 2013



Alan C. Kay
Sr. United States District Judge

Freeland v. County of Maui et al., Civ. No. 11-00617 ACK KSC, Order Granting in Part and Denying in Part Defendants' Motions for Summary Judgment

67